UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

               Plaintiff,               Case No. 17-cr-20644

                                            Paul D. Borman
v.                                     United States District Judge

LEANDER MANN,

               Defendant.

_____/

## OPINION AND ORDER DENYING
## DEFENDANT'S MOTION TO SUPPRESS (ECF NO. 29)

Defendant Leander Mann ("Mann" or "Defendant") is charged in a five count indictment alleging firearm and drug charges. (ECF No. 13, Indictment.) At the time of the conduct that is the subject of the Indictment, Mann was on parole, serving a 1-15 year sentence for a 2016 Second Degree Home Invasion conviction, having previously been convicted of First Degree Home Invasion in 1997 and Second Degree Home Invasion 2010. (Indictment Counts I and II.) On June 15, 2017, parole and peace officers visited Mann's residence to conduct a routine parole compliance check and uncovered suspected crack cocaine, marijuana, drug paraphernalia, and firearms, both on Mann's person and in an upstairs bedroom believed to be Mann's and in an adjoining attic space, leading to the charges in the Indictment. Mann now moves to

suppress the evidence seized during the parole compliance check. (ECF No. 29, Motion to Suppress.) The government filed a Response (ECF No. 30) and Defendant filed a Reply (ECF No. 31). The Court held an initial evidentiary hearing on April 13, 2018, and ordered supplemental briefing which the parties filed. (ECF Nos. 36, 37.) The Court then ordered an additional evidentiary hearing, which was held on May 25, 2018. The Court DENIES the motion to suppress because the search, conducted pursuant to the "upon demand" search condition in Mann's Parole Order, did not violate the Fourth Amendment.

## I.     FACTUAL BACKGROUND

### A.     The Conditions of Mann's 2016 Parole

On January 25, 2016, Defendant was convicted of his fourth home invasion offense and sentenced to 1-15 years of imprisonment. On June 16, 2016, after serving just five months, he was released on parole subject to a number of conditions contained in his Michigan Department Of Corrections ("MDOC") parole release instructions. Specifically, on the date of his parole, Defendant signed a document entitled "Parole Conditions," that provides in pertinent part:

> Parole supervision is intended to protect the public while providing assistance and guidance to facilitate the parolee's transition from confinement to free society. To meet these goals, minimum conditions are established which may be enhanced by special individual conditions. A parolee's failure to comply with _any_ condition may result in revocation and return to confinement.

*       *       *

(4) CONDUCT:  You must not engage in any behavior that constitutes a violation of any criminal law of any unit of government.  You must not engage in assaultive, abusive, threatening or intimidating behavior.  You must not use or possess controlled substances or drug paraphernalia or be with anyone you know to possess these items.

*       *       *

(6) ASSOCIATION: You must not have verbal, written, electronic, or physical contact with anyone you know to be engaged in any behavior that constitutes a violation of any criminal law of any unit of government.

(7)  FIREARMS: You must not own or possess a firearm of any type, including any limitation or simulation of a firearm.  You must not be in the company of anyone you know to possess these items unless you have received written permission from the field agent.

(8) OTHER WEAPONS: You must not own or possess a weapon of any type or any imitation thereof, any ammunition, or any firearm components or be in the company of anyone you know to possess these items.

*       *       *

(10) SPECIAL CONDITION: You must comply with special conditions imposed by the Parole and Commutation Board and with written or verbal orders made by the field agent.

_AGREEMENT OF PAROLE_: I have read or heard the parole conditions and special conditions and have received a copy.  I understand that failure to comply with any of the conditions or special conditions may result in revocation of parole and return to confinement.  I understand

and agree to comply with the parole conditions and special conditions.

(ECF No. 29-2, Def.'s Mot. Ex. A, PgID 100, MDOC Parole Conditions) (emphasis in original). This document bears Defendant's signature and the date June 16, 2016 and is witnessed. The "special conditions" with which Defendant agreed to comply are set forth in the MDOC Michigan Parole Board Order for Parole, also dated June 16, 2016, and specifically identifying Mann and his twenty-four (24) month term of parole. (*Id*. at PgID 99, Michigan Parole Board Order for Parole.) Those "special conditions" include in relevant part:

> 4.2    Written consent to search the parolee's person and/or property, MCL 791.236(19): I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked.

(*Id*.) Mich. Comp. Laws § 791.236, in turn, governs the issuance of parole orders under Michigan law and sets forth a number of conditions that "shall" be contained in a parole order, including the condition contained in Mann's parole order requiring a parolee to consent to a search of his person or property "upon demand:"

> The parole order shall require the parolee to provide written consent to submit to a search of his or her person or property upon demand by a peace officer or parole officer. The written consent shall include the prisoner's name and date of birth, his or her physical description, the date for release on parole, and the ending date for that parole. The prisoner shall sign the written consent before being released on parole. The department shall promptly enter this condition of parole into the department's corrections management information system or offender

management network information system or into a corresponding records management system that is accessible through the law enforcement information network. Consent to a search as provided under this subsection does not authorize a search that is conducted with the sole intent to intimidate or harass.

Mich. Comp. Laws § 791.236(19).

## B. The June 15, 2017 Parole Compliance Check at Mann's Residence

On June 15, 2017, peace and parole officers arrived at Mann's residence at 306 Kenilworth Street in Detroit, Michigan to conduct a parole compliance check. Sgt. Cary Glazer testified at the May 25, 2018 evidentiary hearing regarding the June 15, 2017 parole compliance check at Mann's residence. Sgt. Glazer is a supervisor of Wayne State's crime abatement team. He has held that position for four years and has been a member of the crime abatement team for seven years. Sgt. Glazer has worked in law enforcement for over seventeen years, having previously worked for the Pontiac Police Department. (ECF No. 40, Transcript of May 25, 2018 Evidentiary Hearing 6:21-7:8, "5/25/18 Hr'g Tr.".) Sgt. Glazer has had training in recovery of firearms and narcotics and has personally recovered narcotics or firearms over one hundred times. (*Id*. at 7:16-8:11.)

On June 15, 2017, Sgt. Glazer was working with abatement team members Ed Viverette and Julian Gherasim, as well as MDOC Agent Ed Parker, along with Alcohol Tobacco and Firearms Agents ("ATF") and the Detroit Police Department

Officers ("DPD"). (*Id*. at 8:12-23.) As part of his duties that day, Sgt. Glazer was performing parole compliance checks, which are a routine and regular part of his duties. His team assists MDOC in doing compliance checks to make sure that parolees are adhering to the conditions of their parole, to make sure that they don't have contraband or, if they are sex offenders, that they do not have access to computers, cell phones, or the Internet.

On June 15, 2017, Sgt. Glazer and his team were scheduled to do 10-15 parole compliance checks. (*Id*. at 9:2-10:2.) Sgt. Glazer arrived at Mann's residence at 306 Kenilworth Street, Detroit, Michigan at approximately 10:30 to 11:00 a.m. As Glazer and his team, i.e Viverette, Gherasim, and Agent Parker arrived, Agent Parker observed Leander Mann walking with a female near the Kenilworth residence. (*Id*. at 10:3-11:14.) After they had identified Mann, the team exited their vehicles and Agent Parker made contact with Mann. Because Sgt. Glazer and Officers Viverette and Gherasim are assisting MDOC, they stay back a bit and let MDOC make the initial contact. (*Id*. at 25:22-26:1.) Sgt. Glazer testified that Mann's demeanor was nervous and a little evasive, and Mann was not making eye contact with Agent Parker who had initiated contact. (*Id*. at 11:15-12:6.) Agent Parker asked if they could proceed with the home compliance check and Mann said he could not get into the house. Mann stated that he did not have a key and that his mother or grandmother

would have to let him in at some later time. Sgt. Glazer asked Mann if he was just planning to wait outside until someone let him in, to which Mann responded "yes," which Sgt. Glazer found odd. (*Id*. at 12:7-25.) Sgt. Glazer asked Mann if it takes hours to get in are you just going to wait? And Mann replied "yeah." (*Id*. at 28:21-29:1.)

Mann proceeded to walk around the side of the house, responding to the officers request that he try to get into the house, and was knocking very lightly on what appeared to be a door at the side of the house. Sgt. Glazer, who could only see the lower half of Mann's body because he was blocked by some cars parked in the driveway on the side of the house, (*Id*. at 29:15-30:12, 34:9-22), became concerned for officer safety because he did not know Mann and knew he was on parole and could not see his hands. Sgt. Glazer started to make his way closer to Mann so that he could see his hands and pat him down for weapons. (*Id*. at 13:1-14:4.) As Sgt. Glazer approached Mann to conduct the pat down, but before Sgt. Glazer began the pat down, Officer Gherasim called Glazer's attention to a large bulge in Mann's pants pocket and Glazer could feel the bulge as he began the pat down. (*Id*. at 30:19-31:15.) In his experience, based on his feel when squeezing it and hearing the sound of plastic, Sgt. Glazer believed that the bulge was a package containing narcotics. Sgt. Glazer removed the bulging item in Mann's pocket which was, as Sgt. Glazer suspected,

narcotics (marijuana) which was individually wrapped in small bags. (*Id*. at 14:5-16:4.) At some point, Sgt. Glazer followed other officers to the front of the house where a man believed to be Mann's mother's boyfriend (later identified as Kimland Terry) led officers upstairs to what Mr. Terry identified as Mann's bedroom, where officers found suspected cocaine, marijuana, scales, a razor, and ammunition. (*Id*. at 17:3-12.)

On cross-examination, Sgt. Glazer testified that he had not made a report or any notes regarding the parole compliance check at Mann's residence on June 15, 2017, and was testifying based solely on his memory. (*Id*. at 18:21-19:5.) Sgt. Glazer testified that his team of Officer Viverette, Officer Gherasim, and MDOC Agent Parker were working with ATF and the DPD that day, but ATF and DPD were doing their own set of compliance checks and were not with Sgt. Glazer's team at Mann's residence when the pat down search occurred. (*Id*. at 24:20-25:4.) Sgt. Glazer testified that Mann was not aggressive and was initially cooperative. (*Id*. at 27:15-25.) Sgt. Glazer testified on cross examination that he found approximately $1,300.00 and a cell phone in Mann's other pants pocket. Mann was handcuffed and walked to the front of the house. (*Id*. at 35:5-36:4.) Sgt. Glazer testified that Mr. Terry answered the front door of the house and then officers were led by Mr. Terry around to the back of the house where they were led through another door that led to the upstairs. Sgt.

Glazer never spoke to Mr. Terry.  (*Id*. at 40:11-41:2.)

On redirect, Sgt. Glazer clarified that a photograph of the 306 Kenilworth home that he had been shown on cross examination did not depict the house/driveway as it appeared on June 15, 2017.  Sgt. Glazer conceded that what he recalled as having been a door at the side of the house that Mann was knocking on could have been a window. Sgt. Glazer reiterated that from his vantage point, given the cars parked in the driveway the day of the parole compliance check, he could see Mann along the side of the house but could not see his hands.  Sgt. Glazer reasoned that if Mann had a weapon, he certainly had cover from the cars parked in the driveway, and could have used the weapon. Concerned at that point for officer safety, he approached to conduct a pat down.  (*Id*. at 42:23-44:10.)

Inside the upstairs bedroom to which Mr. Terry led them, officers found a number of items including:

- Four 7.62 caliber ammunition rounds on top of a dresser;

- Mail and an MDOC card in Defendant's name inside the dresser;

- Male clothing and shoes;

- Suspected crack cocaine;

- Unknown white powdery substance;

- Narcotic paraphernalia (numerous scales, baking soda, strainer,

scissors);

- Suspected marijuana (an estimated 33 grams in one mason jar and 12.5 grams in another mason jar on the floor by the bed);

- An envelope addressed to Defendant at the 306 Kenilworth address from Henry Ford Health Systems.

The officers also noticed an attic space located directly above the upstairs bedroom that appeared to be partially open. They searched inside and recovered the following additional items:

- A Norinco 7.62 caliber semi-automatic rifle;

- A rifle magazine loaded with twenty five 7.62 caliber ammunition rounds.

(ECF No. 1, Criminal Complaint ¶ 10; Govt's Br. 7-8, PgID 106-07.)

### C.     Mann's Testimony at the April 13, 2018 Evidentiary Hearing.

Mann took the stand at the April 13, 2018 evidentiary hearing and testified regarding the circumstances surrounding his release on parole from the Macomb Correctional Facility on June 16, 2016. Mann testified that he was paroled to custody at the Macomb County Jail, and not to home, because he had to serve a 90-day detainer. (ECF No. 35, Transcript of April 13, 2018 Evidentiary Hearing 24:25-25:14 "4/13/18 Hr'g Tr.").  On June 16, 2016, the day of his release from the Macomb

County Correctional Facility, Mann was called to the control center with 8-13 other inmates who were being paroled that day. Inmates waited in the control center for the parolee liaison to come out and present the parolees with their release paperwork. (*Id*. at 25:21-26:16.)

The parolee liaison that day, Ms. Walk, arrived late, around 8:30 a.m. and eventually called out the Defendant and presented him with a folder containing papers for him to sign. (*Id*. at 26:23-27:14, 28:3-25.) Mann testified that Ms. Walk did not go over each document individually with him and when he asked for time to read the documents, she told him "either you sign it or we can find you a bunk back on the compound." (*Id.* at 29:4-14.) Mann testified that he did not actually read the parole conditions before he signed the documents and because he was being paroled to custody, he was not given the opportunity to take the documents he signed with him, as he would have been permitted to do if he had been paroled home. (*Id.* at 30:2-17.)

Mann identified a document entitled "Parole Conditions" that he testified he signed on June 16, 2016, at the time he was paroled to the Macomb County Jail. Mann read aloud at the hearing paragraph ten (10) of that document which reads: "SPECIAL CONDITION: You must comply with special conditions imposed by the Parole and Commutation board and with written or verbal orders made by the field agent." (*Id.* at 31:21-32:15.) Mann testified that he was not provided with the

"special conditions" at that time and stated that he signed only three documents that day: the "Parole Conditions" document, a document acknowledging receipt of his Social Security Card that was held in the facility vault, and a document acknowledging that the money in his prison account would be given to him in the form of a check. (*Id.* at 32:17-33:3.) Mann was shown a document entitled "Michigan Parole Board Order for Parole," bearing his personal information, release date of June 16, 2016, and setting forth a parole term of twenty-four (24) months. Section 4.2 of this Order for Parole set forth the search condition pursuant to which Mann "voluntarily consented to a search of [his] person and property upon demand by a peace officer or parole officer." Mann testified that he did not recognize this document and stated that he did not have a copy of this sheet and that this sheet was not presented to him on the day he signed his parole conditions while at the Macomb County Correctional Facility. (*Id.* at 33:4-34:1.)

Mann testified that he understood that if he chose not to sign the parole conditions, his parole would be rescinded and he would be sent back to prison. (*Id.* at 34:5-21.) Mann reiterated that Ms. Walk refused to read the papers to him and said "either sign it or we will find you a bunk." (*Id.* at 36:9-19.)

On cross-examination, the government elicited testimony from Mann that he wanted to go home on parole and that seeing Ms. Walk was "a good thing," and that

he had been paroled before in connection with his previous convictions. Specifically, Mann testified that the was paroled in 2008 after his 1997 conviction for first degree home invasion. (*Id.* at 38:18-39:20.) In connection with his 2008 parole, Mann testified that a parole compliance officer came to his home, talked to his mother, went to Mann's room, looked around, asked if Mann had a job and left. Mann testified that "[his] understanding was when they come to your home, they come to your room, your area of control." (*Id.* at 42:23-25.) Specifically, Mann testified regarding the conditions of his 2008 parole:

> Q. That you understand that they could search your area of control while you're on parole? And that's what this officer, Officer Goins did, but you didn't understand that they could search further than that. Is that what you're saying?
>
> A. The understanding was that anything that – my room, my property was in like if it's my property would be in one room, because they asked my mother specifically where does he stay? Where is his room?
>
> Q: Understood. So this officer did that. He came, he looked around your area of control, your room?
>
> A: Michael Goins, yes.

(*Id.* at 43:1-11.) Mann testified that he did not know if this same condition applied to his June 6, 2016 parole because "[he] never had a chance to go over what it was they wanted." (*Id.* at 43:17-24.)

Mann did testify, however, that after he returned home in 2016 subject to the

conditions of his June 16, 2016 parole, he was visited in May, 2017, by parole agent

Bonds who conducted a search of Mann's residence. Mann testified to the following

understanding of what the search condition of his 2016 parole entailed:

> Q: You were assigned eventually a parole agent named Parole Agent Bonds; is that correct?
>
> A. Yes, ma'am.
>
> *   *   *
>
> Q: And just like Officer Goins, he came to your residence at some point, correct?
>
> A: Yes, ma'am.
>
> Q: That was in actually May of 2017, correct?
>
> A: Yes, ma'am.
>
> Q: So that was before the other check happened where they found the narcotics, correct?
>
> A: Yes ma'am.
>
> *   *   *
>
> Q: So when he came over to your residence, it was your understanding if he wanted to look around your bedroom and your area of control, only that, that he could do that but he couldn't look elsewhere. Is that your understanding?
>
> A: No, he looked in my bedroom.
>
> Q: I understand. But you understood he was permitted to do that in your area of control based on your parole conditions but he wasn't allowed to

search further. Was that your understanding?

A: No, he could search things – like he can search common area, any room that I have access to.

Q: Understood. And but he couldn't – that was your understanding of part of your conditions?

A: Yes, that he could search the house or the room.

(*Id.* at 44:18-21, 45:7-14, 48:5-18.)

Mann testified that he knew he could not get out of jail without signing the

paperwork and he confirmed that he signed the Parole Condition document just

beneath the following legend, which Mann read aloud in Court:

A. *AGREEMENT OF PAROLE*: I have read or heard the parole conditions and special conditions and have received a copy. I understand that failure to comply with any of the conditions or special conditions may result in re[v]ocation of parole and return to confinement. I understand [and] agree to comply with the parole conditions and special conditions.

\*   \*   \*

Q: And your signature is right under that; is that correct?

A. Yes, ma'am.

Q: And you signed that, correct?

A. I signed all of this without reading it. It's like a driver's license. You got sign it to get the license whether –

Q: You got to sign it to get out of jail, correct?

A: Yes.

Q: And would you have preferred to stay in jail or preferred to get out of jail? So knowing all the conditions, we're in court today, would you prefer to stay in jail or get out of jail?

A: Explain – say it slower. You said knowing all the conditions today.

Q: Yep. Knowing all the conditions of parole?

A: Okay.

Q: Would you prefer to be released from jail and agree to those conditions or to stay in jail?

A: Even on everything that I'm going through right now, even with all the conditions, I would still sign this paper because no one wants to be in jail. But I would have rather been informed of what the actual conditions are. Like I was never told what all of it was.

Q: Sure, sure.

A: I was never given the chance to make an informed decision.

(*Id.* at 49:15-25, 50:7-51:6.)

## II.    ANALYSIS

Defendant's argument for suppression of the evidence seized from Mann's residence during the June 15, 2017 parole compliance check has been a bit of a moving target. On the one hand, and certainly in his opening brief, Defendant asked the Court to conclude that the very nature of the circumstances under which any parolee is asked to "give up his Fourth Amendment rights" in return for his freedom

is inherently coercive and the consent given is therefore not voluntary "in the

*Schneckloth*[1] sense:"

> The circumstances surrounding Mann's waiver scream coercion because
> had he not agreed to waive his Fourth Amendment rights, his parole may
> have been rescinded or revoked. (Exh. A). . . . Simply put, Mann had no
> realistic choice. Either sign away his constitutional rights or stay in
> prison. . . . Neither the Supreme Court nor the Sixth Circuit has
> addressed whether parolee consent-to-search provisions constitute
> voluntary consent in the *Schneckloth* sense. . . . Mann was faced with the
> decision to either remain in custody with no constitutional rights
> involving search and seizure or to re-enter society with no constitutional
> rights involving search and seizure. That is simply no choice at all.

(ECF No. 29, Def.'s Mot. 5-9.)

Indeed, in his opening brief, Mann acknowledges his understanding that he

"signed away his Fourth Amendment rights" when he signed his conditions of parole,

attaching both the Parole Condition document that Mann signed as well as the Special

Conditions to which he agreed to be bound that contain the suspicionless search

condition, as Exhibit A to his opening brief.

However, at the April 13, 2018 evidentiary hearing, and in his supplemental

brief filed after that hearing, Defendant appeared to be taking a slightly different tack,

relying on Mann's testimony at the April 13, 2018 evidentiary hearing, and arguing

---

[1] *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), in which the Supreme Court
established the constitutional boundaries of the "voluntary" consent exception to the
warrant and probable cause requirements of the Fourth Amendment.

that because the condition in Mann's Parole Order in which Mann consented to suspicionless searches of his person and property was not sufficiently explained to Mann at the time he signed his Parole Order, the consent obtained was not voluntary. As discussed below, Defendant's argument fails here under either theory based on clear United States Supreme Court precedent.

### A. The Legal Framework Governing Parolee Searches

"The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects." *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990). "However, the Supreme Court has made clear that the nature of the relationship between state actors and individuals subject to state supervision in lieu of or following release from prison alters the relevant analysis under the Fourth Amendment." *United States v. Herndon*, 501 F.3d 683, 687 (6th Cir. 2007). *See also United States v. Sweeney*, 891 F.3d 232, 235-36 (6th Cir. 2018) (noting that one exception to the warrant requirement "allows warrantless searches so long as they are pursuant to a constitutional state law authorizing the warrantless searches of parolees and their residences") (citing *Samson v. California*, 547 U.S. 843, 856 (2006)); *United States v. Smith*, 526 F.3d 306, 308 (6th Cir. 2008) ("[T]he warrant and probable cause requirements generally do not apply to searches of parolees, probationers, or their residences.") (citing *Samson*, 547 U.S. at 857); *United*

*States v. Doxey*, 833 F.3d 692, 703 (6th Cir. 2016) (noting that "the warrant and probable cause requirements generally do not apply to searches of parolees, probationers, or their residences").

"The [Supreme] Court's jurisprudence on the subject has yielded two distinct doctrinal frameworks, set forth most notably in its opinions in *Griffin [v. Wisconsin*, 483 U.S. 868 (1987)], and *United States v. Knights*, 534 U.S. 112 [] (2001)." *Herndon*, 501 F.3d at 687. *See also United States v. Tessier*, 814 F.3d 432, 433 n. 1 (6th Cir. 2016) (noting that "*Griffin* governed our inquiry in *[United States v.] Henry*[, 429 F.3d 603 (6th Cir. 2005)] because the search was made pursuant to a state policy, but *Knights* governs our inquiry here because the search was made pursuant to a condition of probation") (citing *Knights*, 534 U.S. at 117-18). Here the government suggests reliance on both the search condition of parole contained in Mann's Parole Order and the administrative authority for a warrantless parolee search based on reasonable suspicion, as set forth in Mich. Admin. Code § R 791.7735(2)). As the Sixth Circuit recently noted in *Sweeney*, the "totality of the circumstances" analysis, grounded in the "lower expectation of privacy" enjoyed by parolees (and probationers), and set forth in *Knights* and *Samson*, provides the proper analytical framework where, as here, the government relies on a search condition of a parolee's release and does not expressly rely on the *Griffin* special needs exception. 891 F.3d

at 236.  A discussion of *Griffin*, however, is still important to a full understanding of the evolving doctrines governing parolee searches.

### 1.    *Griffin's* Special Needs Framework

In *Griffin*, which was a direct appeal from a state-court conviction, the Supreme Court analyzed the constitutional validity of a Wisconsin regulation that permitted probation officers to conduct warrantless searches of a probationer's home if the probation officer established "reasonable grounds" to believe that the probationer possessed contraband, defined as "any item that the probationer cannot possess under the probation conditions."  483 U.S. at 870-71.  Griffin's probation officer received information from a detective that there might be guns in Griffin's apartment.  *Id*. at 871.  Under the authority of the Wisconsin probation regulation, a probation officer and three plainclothes policemen proceeded to Griffin's residence and informed Griffin that they were there to search his home.  They conducted the search and discovered a handgun.  *Id*.  Griffin was charged under state law with possession of a firearm by a convicted felon and moved to suppress the evidence seized during the search.  *Id*. at 872.  The trial court denied the motion to suppress, Griffin was convicted by a jury, and the Wisconsin Supreme Court ultimately affirmed the denial of the motion to suppress, holding that the "reasonable grounds" standard of the Wisconsin probation regulation satisfied the "reasonable grounds" standard of the

Fourth Amendment.  *Id.*

The United States Supreme Court on appeal, analyzing the issue as falling within a "special needs" exception to the warrant and probable cause requirement, held that "[a] State's operation of a probation system . . . presents 'special needs' beyond normal law enforcement that may justify departures from the usual warrant and probable-cause requirements." *Id.* at 873-74.  The Court noted that "[p]robation, like incarceration, is a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty. . . . [s]imply one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of community service." *Id.* at 874.  Probationers, the Court concluded, like parolees, "do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions." *Id.* (internal quotation marks and citations omitted) (final alteration in original).  Having concluded that Wisconsin's probation regulation addressed a "special need" of the State justifying "a degree of impingement upon privacy that would not be constitutional if applied to the public at large," the Court held that dispensing with the "probable cause" requirement and imposing instead the "reasonable grounds" limitation encompassed by the Wisconsin regulation was constitutionally sufficient and that reliance on an unauthenticated tip from a police

officer on the facts of the case was "reasonable" within the meaning of the Fourth Amendment. *Id*. at 879-80. Thus, in analyzing a "special needs" search of a parolee under *Griffin*,

> courts conduct a two-pronged inquiry. First, courts examine whether the relevant regulation or statute pursuant to which the search was conducted satisfies the Fourth Amendment's reasonableness requirement. If so, courts then analyze whether the facts of the search itself satisfy the regulation or statute at issue.

*United States v. Loney*, 331 F.3d 516, 520 (6th Cir. 2003). And,

> with respect to the first prong of the *Griffin* analysis, it is now beyond question that a state statute survives Fourth Amendment scrutiny if it authorizes searches of parolees based on a reasonable suspicion that an individual is violating the terms or conditions of parole.

*Loney*, 331 F.3d at 521. Because the Supreme Court in *Griffin* "declined to review the determination of 'reasonable grounds' despite the sparseness of the evidence to support the state court's ruling, *Griffin* appears to leave open the possibility that a state may choose a different or lower standard than the federal standard for reasonable suspicion." *United States v. Payne*, 181 F.3d 781, 788 (6th Cir. 1999). In other words, if the courts of a state have spoken on the sufficiency of evidence that will satisfy a "reasonable suspicion" standard, *Griffin* does not appear to have established a constitutional floor. What is clear from *Griffin* however, is "that a state statute authorizing searches of parolees on grounds that satisfy the federal standard for reasonable suspicion would be constitutional." *Payne*, 181 F.3d at 786.

## 2. *Knights'* Totality of the Circumstances Framework

Unlike *Griffin*, *Knights* involved a search condition that was contained in Knights' probation order. Knights' probation order included a condition that Knight would "[s]ubmit his . . . person, property, place of residence, vehicle, personal effects, to search at any time, with or without a search warrant, warrant of arrest or reasonable cause by any probation officer or law enforcement officer." 534 U.S. at 114. Knights signed the probation order indicating that he had read and understood the conditions of his probation. *Id*. Three days after Knights was placed on probation, detectives suspected that he was involved in a series of arson attacks at several Pacific Gas & Electric plants. Detectives set up surveillance of Knights' home and observed suspicious items being carried to Knights' truck and observed a number of suspicious items in Knights truck. *Id*. Ultimately one of the detectives, who was aware of the search condition in Knights' probation order, decided to conduct a search of Knights' apartment, which revealed several items that connected Knights to the arson attacks. The district court found that the detectives had reasonable suspicion to believe that Knights was involved in criminal activity, but because the search was "investigatory" rather than related to Knights' probationary status, the district court suppressed the evidence. *Id*. at 115.

The Supreme Court declined to limit the search pursuant to Knights' probation

condition to one "with a probationary" rather than "an investigatory" purpose. *Id*. at

115. The Court rejected petitioner's efforts to limit the constitutionality of a

warrantless search of a probationer to the precise facts of *Griffin*, i.e. "a 'special need'

search conducted by a probation officer monitoring whether the probationer is

complying with probation restrictions." *Knights*, 534 U.S. at 117. The Court in

*Knights* found such a limitation "contrary to *Griffin's* express statement that its

'special needs' holding made it 'unnecessary to consider whether' warrantless

searches of probationers were otherwise reasonable within the meaning of the Fourth

Amendment." 543 U.S. at 117-18. Rather, the Court took into consideration "the

totality of the circumstances" surrounding the search, with the probation condition

being a "salient circumstance," and found the search reasonable under the Fourth

Amendment.

Importantly, as discussed *infra*, the Court in *Knights* expressly declined to rest

its holding on the theory that Knight had "consented" to the warrantless search, "in

the "*Schneckloth* sense," by accepting the search condition of his probation, referring

to *Schneckloth v. Bustamonte*, 412 U.S. 218 (1973), in which the Supreme Court

established the constitutional boundaries of the "voluntary" consent exception to the

warrant and probable cause requirements of the Fourth Amendment. Instead, the Court

in *Knights* applied the general Fourth Amendment "totality of the circumstances"

analysis to Knights' search:

> We need not decide whether Knights' acceptance of the search condition constituted consent in the *Schneckloth* sense of a complete waiver of his Fourth Amendment rights, however, because we conclude that the search of Knights was reasonable under our general Fourth Amendment approach of "examining the totality of the circumstances," *Ohio v. Robinette*, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996), with the probation search condition being a salient circumstance.

534 U.S. at 118.

The Court in *Knights* reasoned as follows in finding the search reasonable

within the meaning of the Fourth Amendment:

> The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Wyoming v. Houghton*, 526 U.S. 295, 300, 119 S.Ct. 1297, 143 L.Ed.2d 408 (1999). Knights' status as a probationer subject to a search condition informs both sides of that balance. "Probation, like incarceration, is 'a form of criminal sanction imposed by a court upon an offender after verdict, finding, or plea of guilty.' " *Griffin, supra*, at 874, 107 S.Ct. 3164 (quoting G. Killinger, H. Kerper, & P. Cromwell, Probation and Parole in the Criminal Justice System 14 (1976)). Probation is "one point . . . on a continuum of possible punishments ranging from solitary confinement in a maximum-security facility to a few hours of mandatory community service." 483 U.S., at 874, 107 S.Ct. 3164. Inherent in the very nature of probation is that probationers "do not enjoy 'the absolute liberty to which every citizen is entitled.'" *Ibid*. (quoting *Morrissey v. Brewer*, 408 U.S. 471, 480, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972)). Just as other punishments for criminal convictions curtail an offender's freedoms, a court granting probation may impose reasonable conditions that deprive the offender of some freedoms enjoyed by law-abiding citizens.

The judge who sentenced Knights to probation determined that it was necessary to condition the probation on Knights' acceptance of the search provision. It was reasonable to conclude that the search condition would further the two primary goals of probation-rehabilitation and protecting society from future criminal violations. The probation order clearly expressed the search condition and Knights was unambiguously informed of it. The probation condition thus significantly diminished Knights' reasonable expectation of privacy.

534 U.S. at 118-20. The Supreme Court in *Knights* reiterated that it was not deciding whether a search based on no suspicion at all (or on the defendant's consent to the condition of suspicionless searches) would be constitutional:

We do not decide whether the probation condition so diminished, or completely eliminated, Knights' reasonable expectation of privacy (or constituted consent, *see supra*, at 591) that a search by a law enforcement officer without any individualized suspicion would have satisfied the reasonableness requirement of the Fourth Amendment. The terms of the probation condition permit such a search, but we need not address the constitutionality of a suspicionless search because the search in this case was supported by reasonable suspicion.

534 U.S. at 120 n. 6. The probation search condition, although it allowed for a search without individualized suspicion, was just "a salient circumstance" in the Court's general Fourth Amendment totality-of-the-circumstances analysis which, in Knights case, yielded a finding of reasonableness

3. ***Samson's* Suspicionless Search Holding**

The Supreme Court granted certiorari in *Samson* "to answer a variation of the question [the] Court left open in *Knights* [] – whether a condition of release can so

diminish or eliminate a released prisoner's reasonable expectation of privacy that a suspicionless search by a law enforcement officer would not offend the Fourth Amendment." 547 U.S. at 847. The relevant California statute pursuant to which a suspicionless search provision was made a condition of Samson's release on parole provides that "every prisoner eligible for release on state parole 'shall agree in writing to be subject to search or seizure by a parole officer or other peace officer at any time of the day or night, with or without a search warrant and with or without cause.'" 547 U.S. at 846 (quoting Cal. Penal Code Ann. § 3067(a)). A police officer from the San Bruno Police Department, who knew Samson was on parole, stopped Samson on the street inquiring whether Samson had an outstanding parole warrant. *Id.* After confirming that Samson did not have an outstanding warrant, the officer decided, based solely on Samson's status as a parolee, to search Samson. In the course of the search, the officer found a box in Samson's pocket that contained a plastic baggie containing methamphetamine. *Id.* Samson was charged by the State with possession of methamphetamine and convicted, after the trial court denied Samson's motion to suppress. The California Court of Appeals affirmed the denial of the motion to suppress, holding "that suspicionless searches of parolees are lawful under California law; that [s]uch a search is reasonable within the meaning of the Fourth Amendment as long as it is not arbitrary, capricious or harassing; and that the search in this case

was not arbitrary, capricious, or harassing." *Id.* at 847 (internal quotation marks and citations omitted).

The Supreme Court analyzed the search under its "general Fourth Amendment approach," examining "the totality of the circumstances" to determine whether the search was reasonable under the Fourth Amendment. *Id.* at 848. Quoting extensively from *Knights* and employing similar reasoning, the Court measured the reasonableness of the search "by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests." *Id.* (internal quotation marks and citations omitted). Directing its attention to Samson's status as a parolee, rather than a probationer, the Court reasoned:

> As we noted in *Knights*, parolees are on the "continuum" of state-imposed punishments. On this continuum, parolees have fewer expectations of privacy than probationers, because parole is more akin to imprisonment than probation is to imprisonment. As this Court has pointed out, parole is an established variation on imprisonment of convicted criminals . . . . The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence. In most cases, the State is willing to extend parole only because it is able to condition it upon compliance with certain requirements. . . . The extent and reach of these conditions clearly demonstrate that parolees like petitioner have severely diminished expectations of privacy by virtue of their status alone.

547 U.S. at 850-51 (internal quotation marks and citations omitted). The Court found

that Samson, like Knights, had accepted the California parole search condition:

> [A]s we found "salient" in *Knight*s with respect to the probation search condition, the parole search condition under California law—requiring inmates who opt for parole to submit to suspicionless searches by a parole officer or other peace officer "at any time," Cal.Penal Code Ann. § 3067(a) (West 2000)—was "clearly expressed" to petitioner. *Knights*, 534 U.S., at 119, 122 S.Ct. 587. He signed an order submitting to the condition and thus was "unambiguously" aware of it. *Ibid*. In *Knights*, we found that acceptance of a clear and unambiguous search condition "significantly diminished Knights' reasonable expectation of privacy." *Id.*, at 120, 122 S.Ct. 587. Examining the totality of the circumstances pertaining to petitioner's status as a parolee, "an established variation on imprisonment," *Morrissey*, 408 U.S., at 477, 92 S.Ct. 2593, including the plain terms of the parole search condition, we conclude that petitioner did not have an expectation of privacy that society would recognize as legitimate.

547 U.S. at 852. Balancing this significantly diminished expectation of privacy against the State's "overwhelming interest" in supervising parolees, which was established by a substantial amount of empirical evidence in the record regarding rates of recidivism in California, the Court concluded that "the Fourth Amendment does not prohibit a police officer from conducting a suspicionless search of a parolee." *Id*. at 857. The Court was unpersuaded by petitioner's evidence of the practices of other states and the federal government:

> That some States and the Federal Government require a level of individualized suspicion is of little relevance to our determination whether California's supervisory system is drawn to meet its needs and is reasonable, taking into account a parolee's substantially diminished expectation of privacy.

547 U.S. at 855.  In *Samson* the Supreme Court observed that the "touchstone" of the

Fourth Amendment is reasonableness not individualized suspicion:

> The touchstone of the Fourth Amendment is reasonableness, not individualized suspicion. Thus, while this Court's jurisprudence has often recognized that "to accommodate public and private interests some quantum of individualized suspicion is usually a prerequisite to a constitutional search or seizure," *United States v. Martinez–Fuerte*, 428 U.S. 543, 560, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976), we have also recognized that the "Fourth Amendment imposes no irreducible requirement of such suspicion," *id.*, at 561, 96 S.Ct. 3074. Therefore, although this Court has only sanctioned suspicionless searches in limited circumstances, namely, programmatic and special needs searches, we have never held that these are the only limited circumstances in which searches absent individualized suspicion could be "reasonable" under the Fourth Amendment. In light of California's earnest concerns respecting recidivism, public safety, and reintegration of parolees into productive society, and because the object of the Fourth Amendment is reasonableness, our decision today is far from remarkable. Nor, given our prior precedents and caveats, is it "unprecedented."

547 U.S. at 855 n. 4.  Balancing the special needs of the State of California in

supervising its parolees, against the privacy interests of a parolee who had

acknowledged in writing that he would be subject to suspicionless searches as a

condition of his release into the community while still serving his sentence, the

Supreme Court found the Fourth Amendment reasonableness standard satisfied.

Notably, however, as it had done in *Knights*, the Supreme Court in *Samson*

expressly declined to decide whether a parolee's acceptance of a warrantless search

provision as a condition of parole could constitute "consent" in the *Schneckloth* sense:

"Because we find that the search at issue here is reasonable under our general Fourth Amendment approach, we need not reach the issue whether "acceptance of the search condition constituted consent in the *Schneckloth [v. Bustamonte*, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)] sense of a complete waiver of his Fourth Amendment rights." *Samson*, 547 U.S. at 852 n. 3. The Supreme Court then noted that the California Supreme Court had not yet construed the California mandatory parolee search conditions but the California Court of Appeals had concluded that an inmate's refusal to accept the mandatory search condition would result in continued incarceration. Nonetheless, the Supreme Court in *Samson* declined to rest its holding on the issue of consent because the California Supreme Court had not "had a chance to address the question squarely." *Id*.

The Sixth Circuit, in *United States v. Tessier*, 814 F.3d 432 (6th Cir. 2016), fully embraced the *Knights/Samson* analysis and upheld a suspicionless search of a parolee, rejecting the parolee's argument "that the Fourth Amendment requires at least reasonable suspicion for probationer home searches." *Id*. at 434. The search of the defendant in *Tessier* was part of a general sweep of the residences of all known sex offenders in the Tennessee county where defendant lived. *Id*. at 435 (Siler, J. Concurring). There was no dispute that there was no reasonable suspicion for the search of defendant and that the sole basis for the search was the search condition that

defendant had accepted as a condition of his parole which allowed for "a search, without warrant, of my person, vehicle, property, or place of residence by any Probation/Parole officer or law enforcement officer, at any time." *Id*. at 433. The Sixth Circuit adopted the district court's "Fourth Amendment reasonableness approach employed by the Supreme Court in *Knights*," noting that "*Knights* held that reasonable suspicion is sufficient to uphold a search of a probationer who is subject to a search condition but left open the question of whether reasonable suspicion is *required* to search a probationer who is subject to a search condition." *Id*. at 435 (emphasis added). Both the Sixth Circuit and the district court stressed the significance of the existence of a signed probation order that permits searches for any purpose. In signing such an order, the parolee necessarily understands that he has a significantly diminished expectation of privacy. 814 F.3d at 434. Balanced against the significant interests of the State in supervising parolees, the reasonableness standard of the Fourth Amendment was satisfied with regard to this suspicionless search.

Similarly, in *United States v. Smith*, 526 F.3d 306 (6th Cir. 2008), the Sixth Circuit relied on *Samson* in finding that a suspicionless search of the residence of an individual serving out a sentence in a community residential program did not violate the Fourth Amendment. Acting on a tip, MDOC officers forced their way into Smith's home "searched the basement (where they believed Smith was staying) and

discovered two loaded guns under a mattress in the corner of the room." *Id*. at 308.

Smith moved to suppress the evidence obtained as a result of the search. The Sixth

Circuit relied on *Samson* in upholding the district court's denial of the motion to

suppress:

> In assessing Smith's situation, *Samson* provides considerable guidance. There, an officer conducted a suspicionless search of a parolee walking down the street. 547 U.S. at 846–47, 126 S.Ct. 2193. A condition of Samson's parole order required him "to be subject to search or seizure ... at any time of the day or night, with or without a search warrant and with or without cause." *Id*. at 846, 126 S.Ct. 2193 (internal quotation marks omitted). After balancing Samson's privacy interests against the State's law-and-order interests, the Court held that the search was reasonable because (1) Samson's status as a parolee, together with his parole-search condition, deprived him of "an expectation of privacy that society would recognize as legitimate" and (2) the State has an "overwhelming interest in supervising parolees." *Id*. at 850, 852–53, 126 S.Ct. 2193 (internal quotation marks omitted).

526 F.3d at 309. The Sixth Circuit concluded that "[i]f the extent and reach of

[Samson's] conditions clearly demonstrate[d] that [he had] severely diminished

expectations of privacy by virtue of [his] status alone,' then the same assuredly was

true for Smith." *Id*. (quoting *Samson*, 547 U.S. at 852) (alterations in original).

The Sixth Circuit recently acknowledged *Samson's* holding in *Sweeney*, *supra*.

Importantly, the Sixth Circuit expressly noted in *Sweeney* that the basis for the

Supreme Court's holding in *Samson* was rooted in the diminished expectation of

privacy inherent in the status of a parolee:

33

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Though "this fundamental right is preserved by a requirement that searches be conducted pursuant to a warrant issued by an independent judicial officer," there are "exceptions to the general rule that a warrant must be secured before a search is undertaken." *California v. Carney*, 471 U.S. 386, 390, 105 S.Ct. 2066, 85 L.Ed.2d 406 (1985).

One such exception allows warrantless searches so long as they are pursuant to a constitutional state law authorizing the warrantless searches of parolees and their residences. *See Samson v. California*, 547 U.S. 843, 856, 126 S.Ct. 2193, 165 L.Ed.2d 250 (2006).

*       *       *

[T]he Supreme Court has grounded this exception in the lower expectation of privacy enjoyed by [parolees], which is weighed against the promotion of legitimate governmental interests to determine whether the search was reasonable under "the totality of the circumstances." *Samson*, 547 U.S. at 849–52, 126 S.Ct. 2193.

891 F.3d at 235-36.

> **B.**     **Mann Was Adequately Apprised of the Nature of the Special Search Condition Governing His Parole, and Specifically Was Cognizant of the Diminished Expectation of Privacy he Enjoyed as a Condition of his Parole When Officers Conducted the Parole Home Compliance Check at Issue Here**

Defendant urges this Court to take up the issue not dealt with by the Supreme

Court in *Knights* and again in *Samson*, but the Court finds no basis on the facts of this

case to deviate from those decisions because the search of Mann and his residence

satisfies the Fourth Amendment under the "totality of the circumstances" approach

applied in *Samson*.  As in *Tessier*, *supra*, where the Sixth Circuit also expressly declined to address a "consent" theory "because the search was reasonable under the general Fourth Amendment totality-of-the-circumstances approach," the Court declines to do so here.  814 F.3d at 434.

In *Tessier*, the Sixth Circuit observed that "the Tennessee Supreme Court has indicated that it views the Tennessee standard search condition as permitting suspicionless searches."  *Id*.  While the Michigan Supreme Court has not construed the authorization for the suspicionless search condition set forth in Mich. Comp. Laws § 791.236(19), pursuant to which Mann's suspicionless search condition was included in his Parole Order, the Michigan Court of Appeals and other courts in this District have done so, uniformly concluding that such a condition is valid under *Samson*.  In *Dixon v. Kraft*, No. 16-14439, 2018 WL 636243 (E.D. Mich. Jan. 31, 2018), a 42 U.S.C. § 1983 action filed by a parolee against parole and peace officers for violation of his Fourth Amendment rights for conducting a suspicionless parole compliance check on his residence,  Chief Judge Denise Page Hood rejected the parolee's argument "that he never signed the special conditions of parole document requiring that he consent to a search of his person or property upon demand of a peace officer." *Id*. at *1.  Examining a parole order containing language identical to Mann's, Chief Judge Hood reasoned:

Plaintiff signed a document on September 24, 2014 titled "PAROLE CONDITIONS," with the signature right below an "AGREEMENT OF PAROLE" statement, pursuant to which Plaintiff represented that he had "read or heard the parole conditions and special conditions and received a copy" of them. The "PAROLE CONDITIONS" included the following paragraph:

> (10) SPECIAL CONDITION: You must comply with special conditions imposed by the Parole and Commutation Board and with written or verbal orders made by the field agent.

In Exhibit 1 to the Motion for Summary Judgment filed by Defendants Kraft, Duffing, and Bennett, the "Special Conditions" applicable to Plaintiff's parole commencing on September 24, 2014 (the same date he signed his "Parole Conditions") include the following paragraph:

> 4.2 Written Consent to Search the Parolee's person and/or property, MCL 791.236(19): I voluntarily consent to a search of my person and property upon demand by a peace officer or parole officer. If I do not sign this written consent, I understand that my parole may be rescinded or revoked.

Contrary to Plaintiff's objection, the Court concludes that Plaintiff did sign and consent to being searched upon demand, even without reasonable suspicion.

2018 WL 636243, at *2. Chief Judge Hood adopted the Magistrate Judge's Report

and Recommendation, which concluded that Dixon was bound by the suspicionless

search condition under the Supreme Court's decision in *Samson*:

> Dixon argues that he did not sign a "Consent Form" allowing for suspicionless searches, [ECF No. 15, PageID 131], but his agreement to comply with all of the special conditions of his release constitutes the "written consent" required by § 791.236(19).

Case law establishes that Dixon is bound by his consent to suspicionless searches. In *Samson v. California*, 547 U.S. 843, 852 (2006), the Court upheld a search because of the "plain terms" of parole requiring the parolee to agree to be searched at any time. The Court explained that parolees enjoy few expectations of privacy because parole is a variation of imprisonment. "The essence of parole is release from prison, before the completion of sentence, on the condition that the prisoner abide by certain rules during the balance of the sentence." *Id*. (citation and quotation marks omitted). In *United States v. Smith*, 526 F.3d 306, 309-10 (6th Cir. 2008), a prisoner was serving the end of his sentence in a community residential home, and was subject to electronic monitoring. The court rejected a motion to suppress guns and drugs that were found in his basement because the defendant was made "'aware' that his home was subject to search at any time, with or without suspicion," and thus enjoyed little, if any, reasonable expectation of privacy. *Id*. And in *United States v. Stevenson*, No. 14-20219, 2015 WL 3651016, at *1 (E.D. Mich. June 11, 2015), the court found that the "special conditions" language on a signed parole conditions form itself established consent to search his residence.

*Dixon v. Kraft*, No. 16-14439, 2017 WL 9477688, at *3 (E.D. Mich. Dec. 7, 2017) (Stafford, MJ). Thus, under *Samson*, *Smith*, and *Stevenson*, the court concluded, Dixon possessed a greatly diminished expectation of privacy and the suspicionless search did not violate his Fourth Amendment rights. *Id*. at *4.

Similarly, in the recent unpublished decision of the Michigan Court of Appeals in *People v. Merchant*, No. 335506, 2017 WL 5503791 (Mich. Ct. App. Nov. 16, 2017), the court assumed that such suspicionless searches would pass constitutional scrutiny, although grounding its decision on other bases in upholding the search:

In this case, as a parolee who agreed to searches "upon demand" as a condition of his parole, MCL 791.236(19), defendant had a significantly

diminished reasonable expectation of privacy, and he could be subjected to even suspicionless searches without violation of the Fourth Amendment.

2017 WL 5503791, at *1 (citing *Samson*, 547 U.S. 843, 857 (2006)).

Importantly, the Michigan statute authorizing a suspicionless consent to search as a condition of parole, MCL 791.236(19), is not without limits and does not authorize "a search that is conducted with the sole intent to intimidate or harass." *See Samson*, 547 U.S. at 856 (finding any concern that California's suspicionless search system permits "a blanket grant of discretion untethered to any procedural safeguards . . . belied by California's prohibition on 'arbitrary, capricious or harassing'"); *Tessier*, 814 F.3d at 435 ("We do not address the question of whether a search of a probationer's home that has no legitimate law enforcement or probationary purpose – such as a search with no purpose other than to harass the probationer – would be reasonable under the Fourth Amendment."). There is no argument or suggestion here that the June 15, 2017, mid-morning routine parole compliance check of Mann and his residence was intended to harass or intimidate Mann.

Defendant attempts to distinguish this case from *Samson*, arguing that Mann, unlike Knights and Samson, was not fully informed of the suspicionless search condition of his probation when he hurriedly signed his Parole Order on June 16, 2016, and did not understand that he could be subject to a search without reasonable

suspicion at any time as a condition of his parole.  The government argues that the Supreme Court's discussion of the fact that the search condition was "clearly expressed" to the parolee in *Samson* was "not part of the holding" of *Samson*, and that the California statute at issue in *Samson* "required searches of all parolees, whether they signed a parole condition or not."  (5/25/18 Hr'g Tr. 59:13-60:10.)  Regardless of whether the parolee's understanding of the condition was necessary to the Court's holding in *Samson*, it is undisputed that the Supreme Court considered it a "salient" factor in the Fourth Amendment calculus in both *Knights* and *Samson*.  And so the Court considers the issue here and concludes that Mann was well aware of the diminished expectation of privacy he possessed as a result of his parole and fully understood that he was subject to a parole compliance search of his person and home upon the demand of his parole officer and without a warrant or reasonable suspicion.

First and most fundamentally, as Chief Judge Hood and Magistrate Judge Stafford concluded in *Dixon*, the fact that Mann signed his name right below a legend that clearly stated he had been informed of or had read all of the special conditions to which he agreed to be bound, is sufficient in and of itself to charge Mann with knowledge of the special suspicionless search condition.  But more importantly, this Court heard Mann's testimony regarding his understanding of what he had agreed to in signing that Parole Order and finds incredible the claim that Mann did not know,

at the time of the June 15, 2017 parole compliance check of his home, that those officers could search his person and/or enter his home and search his residence "upon demand," and without a warrant or any degree of suspicion. Even assuming that Mann was unaware that he had agreed to such a condition on the day he was paroled and signed his Parole Order, he most certainly understood this condition after Agent Bonds visited him in May, 2017, and searched his home without a warrant and without any basis to suspect that Mann was violating his parole. By Mann's own admission, he understood after that visit (if not before) that under the conditions of his June 16, 2016 Parole, a parole officer could appear for a parole compliance check and demand to search anywhere in Mann's residence:

> Q: You were assigned eventually a parole agent named Parole Agent Bonds; is that correct?
>
> A. Yes, ma'am.
>
> *          *          *
>
> Q: And just like Officer Goins, he came to your residence at some point, correct?
>
> A: Yes, ma'am.
>
> Q: That was in actually May of 2017, correct?
>
> A: Yes, ma'am.
>
> Q: So that was before the other check happened where they found the narcotics, correct?

A: Yes ma'am.

*             *             *

Q: So when he came over to your residence, it was your understanding if he wanted to look around your bedroom and your area of control, only that, that he could do that but he couldn't look elsewhere. Is that your understanding?

A: No, he looked in my bedroom.

Q: I understand. But you understood he was permitted to do that in your area of control based on your parole conditions but he wasn't allowed to search further. Was that your understanding?

A: No, he could search things – like he can search common area, any room that I have access to.

Q: Understood. And but he couldn't – that was your understanding of part of your conditions?

A: Yes, that he could search the house or the room.

(*Id.* at 44:18-21, 45:7-14, 48:5-18.)

There is no question that Mann, by his own admission, understood very well the diminished expectation of privacy he possessed as a parolee, if not at the time that he signed his Parole Order on June 15, 2016, certainly no later than May, 2017, when Agent Bonds conducted a parole compliance check at Mann's residence and searched the home. And, as a point of note, Mann also testified that knowing everything he knows today, and knowing that he would be subject to suspicionless searches of his person and property at the simple demand of a parole officer, he still would have

signed that Parole Order and elected to leave prison and return to his home: "Even on everything that I'm going through right now, even with all the conditions, I would still sign this paper because no one wants to be in jail." (4/13/18 Hr'g Tr. 50:25-51:2.)

This case is appropriately and fully resolved under *Samson*. Defendant argues that the initial entry into the home itself was illegal based upon a lack of consent – Mann does not distinguish beyond the initial entry among the various areas of the home that were searched, arguing that everything seized beyond the initial entry "was illegal and all fruits from that search must be suppressed." (Def.'s Mot. 12.) Mann conceded at the May 25, 2017, evidentiary hearing that "if the Court finds that the parolee consent condition was fine, then yes, the parole officer can get into the home because there's consent . . . ." (5/25/18 Hr'g Tr. 51:3-25.) The Court concludes that the June 15, 2017 search of Mann's person and home pursuant to the search condition of his Parole Order satisfied the demands of the Fourth Amendment under the "totality of the circumstances" as set forth in *Samson*. Accordingly, Mann's Motion to Suppress is DENIED.

### C. The Search of Mann's Person and Home Was Based Upon Reasonable Suspicion Under the Provisions of the Michigan Administrative Code

Although the Court need not reach Mann's alternative argument, i.e. that officers did not have reasonable suspicion to believe that Mann had violated his parole

as would have justified the search under the parolee search provision of the Michigan Administrative Code, the Court finds that officers did have reasonable suspicion both to search Mann and to search his residence. Even if Mann had not signed a Parole Order specifically setting forth the suspicionless search condition of his parole, he would be subject to search, based solely on his status as a Michigan parolee, under Mich. Admin. Code § R791.7735, which provides:

R 791.7735. Search of parolee's person or property.

Rule 735. (1) A parole agent may conduct a warrantless search of a parolee's person or property under any of the following circumstances:

> (a) Incident to a lawful arrest pursuant to section 39 of Act No. 232 of the Public Acts of 1953, as amended, being S791.239 of the Michigan Compiled Laws.

> (b) A stop and frisk, if there is reasonable cause to believe that the parolee is presently involved in criminal conduct, has violated a condition of parole, or is carrying a weapon.

> (c) Seizure of evidence or contraband in plain view.

> (d) With the consent of the parolee or a third party having mutual control over the property to be searched.

(2) Where none of the circumstances specified in subrule (1) of this rule are present and there is reasonable cause to believe that a violation of parole exists, a parole agent may conduct a search of a parolee's person or property if, as soon as possible thereafter, the parole agent files a written report with his or her supervisor setting forth the specific reasons for the search, describing the location or place searched, and describing the specific items seized.

Mich. Admin. Code § R 791.7735(2).

There is no dispute that the Michigan Administrative Code provision authorizes a warrantless search of a parolee "where there is reasonable cause to believe that a violation of parole exists." Mich. Admin. Code § R 791.7735(2). "'Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring 'articulable reasons' and 'a particularized and objective basis for suspecting the particular person . . . of criminal activity.'" *United States v. Henry*, 429 F.3d 603, 609-10 (6th Cir. 2005) (quoting *Payn*e, 181 F.3d at 788). The Sixth Circuit has held that "Michigan's 'reasonable grounds standard,'" as set forth in Mich. Admin. Code § R 791.7735(2), "mirrors . . . the federal reasonable suspicion standard," and therefore satisfies the Fourth Amendment reasonableness requirement. *Doxey*, 833 F.3d at 703-04.

Mann argues that Officers did not have reasonable suspicion to conduct a pat down search of Mann outside his home, which uncovered marijuana in his pants pocket – a clear violation of the terms of his parole and a basis for the subsequent search of his home. The Court, having heard and credited the testimony from Sgt. Glazer at the May 25, 2018 evidentiary hearing, disagrees with Defendant and finds that the Officers had reasonable suspicion to search Mann as he stood outside his home allegedly "attempting" to gain entrance.

Sgt. Glazer testified, as set forth in detail *supra*, that Mann appeared nervous and a little evasive and was not making eye contact with MDOC Agent Parker. Sgt. Glazer found it odd that Mann did not have a key to the house and was planning to just wait around for "hours" if necessary to be let in to his own home. Sgt Glazer also found it strange that Mann, while allegedly attempting to get someone inside the home to answer the door, was knocking "very lightly" at the side of the house and did not even try to get someone to answer the front door. Sgt. Glazer's view of Mann at the side of the house was obstructed by a car parked in the driveway and Sgt. Glazer could not see Mann's hands. Sgt. Glazer, knowing that Mann was a parolee and observing Mann's strange and evasive behavior, and also sensing the vulnerable situation officers were in at the side of the home and having only a partial view of Mann who was obstructed by a parked car, became concerned for officer safety and moved toward Mann to do a pat down search for weapons. The Court finds that at this point, given the circumstances presented during this parolee home compliance check as articulated by Sgt. Glazer, he had "a particularized and objective basis for suspecting [Mann]. . . of criminal activity." *Henry*, 429 F.3d at 609-10 (internal quotation marks and citation omitted) (alterations added). "The reasonableness of an articulable suspicion is assessed with reference to the totality of the relevant circumstances." *United States v. Saucedo*, 226 F.3d 782, 789 (6th Cir. 2000). Here, in the context of

this parole home compliance check, Sgt. Glazer has articulated "more than an inchoate and unparticularized suspicion or hunch" based on his observation that Mann appeared to be avoiding letting officers into his home, was acting evasive, had oddly led officers to the side of the home rather than approaching the front door, may have possessed a weapon and was standing behind the cover of a car. *Id.*

As Sgt. Glazer approached Mann to conduct the pat down for weapons, Officer Gherasim drew Sgt. Glazer's attention to a large bulge in Mann's pants pocket which Sgt. Glazer, based on his 17 years of experience in recovering narcotics and firearms, suspected could be drugs or a weapon. As Sgt. Glazer felt the bulge during the pat down, he strongly suspected that the bulge was drugs, based on the shape of the bulge and the feel and sound of plastic when he squeezed it. At this point, Sgt. Glazer had a "particularized and objective basis" for suspecting that Mann had violated the terms of his parole by possessing narcotics. Sgt. Glazer removed the bulging item which did turn out to be narcotics (marijuana) in plastic baggies, at which point Sgt. Glazer confirmed that Mann had violated the conditions of his parole and officers then had reasonable suspicion to believe that further evidence of parole violations would be found inside the home.[2]

---

[2] Mann also argues that the entry into the home at this point was without the consent of the parolee or somebody with actual or apparent authority to allow entry into the home. Of course the Court's holding that Mann consented to the suspicionless search

The Court need not reach the issue of reasonable suspicion under Mich. Admin. Code § R 791.7735, given the Court's conclusion that the search of Mann and his residence pursuant to the search condition of his Parole Order did not violate the Fourth Amendment. The Court finds, however, that Sgt. Glazer's testimony establishes that Officers did have reasonable suspicion to search both Mann and his residence on June 15, 2017, when Officers visited Mann's residence to conduct a parole home compliance check.

---

of his person and property by virtue of the search condition in his probation order obviates the need for the government to establish consent. However, even were the Court to reach this issue, the Court would conclude that having uncovered drugs in Mann's pants pocket, a clear violation of his parole, officers did not need anyone's consent to conduct a search of Mann's home, as they clearly possessed reasonable suspicion that further evidence of parole violations would be found in the home. In addition, there appears to be no dispute that Kimland Terry, whom all parties agree ultimately answered the front door of Mann's residence, provided the key that opened the door that led to the room where the additional drugs, ammunition, firearms, etc. were found. (ECF No. 1, Criminal Complaint ¶ 9.) While there has been argument by the government regarding whether or not the room searched was in fact Mann's bedroom, and whether or not Mann even had an expectation of privacy in that room sufficient to support standing to bring this motion to suppress, there is no sworn testimony or evidence in this record on which this Court could make any determination regarding that issue.

## III. CONCLUSION

For the foregoing reasons, the Court DENIES the motion to suppress.

IT IS SO ORDERED.

s/Paul D. Borman
Paul D. Borman
Dated: June 19, 2018                          United States District Judge